UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| BARBARA A. BENEDICT, | ) | CASE NO. C05-0118-RSM-MAT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | RE: SOCIAL SECURITY |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) | DISABILITY APPEAL |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff Barbara A. Benedict proceeds through counsel in her appeal of a final decision of the Commissioner of the Social Security Administration (Commissioner). The Commissioner denied plaintiff's application for Disability Insurance (DI) benefits after a hearing before an Administrative Law Judge (ALJ).

Having heard oral argument on this matter and considered the ALJ's decision, the administrative record (AR), and all memoranda of record, it is recommended that the this matter be REMANDED for an award of benefits. It is also recommended that on remand the ALJ should consider whether to reopen the February 28, 2000 decision denying plaintiff's July 16, 1999 application for DI benefits.

/ / /

/ / /

/ / /

REPORT AND RECOMMENDATION RE: SOCIAL
SECURITY DISABILITY APPEAL
PAGE -1

## FACTS AND PROCEDURAL HISTORY

Plaintiff was born on XXXX, 1944.[1] She has a high school education. Plaintiff previously worked as an administrative assistant, receptionist, tourism information clerk, food demonstrator, agriculture mapping clerk, loan processor, personnel clerk, newspaper deliverer, and accounts payable clerk.

Plaintiff filed an application for DI benefits on November 27, 2000, alleging a disability onset date of September 9, 1998.[2] Plaintiff's application was denied initially and on reconsideration, and she timely requested a hearing.

ALJ Ruperta M. Alexis held a hearing on January 16, 2003, and heard testimony from plaintiff, vocational expert Paul Tomita, and medical expert Wil B. Nelp, M.D. On June 2, 2003, the ALJ issued a written decision denying plaintiff's application for DI benefits. (AR 18-29). Plaintiff appealed the ALJ's decision to the Appeals Council, which declined to review plaintiff's claim. (AR 10-12). Plaintiff appealed this final decision of the Commissioner to this Court. At plaintiff's request, the Court heard oral argument on August 31, 2005.

## JURISDICTION

The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

The Commissioner follows a five-step sequential evaluation process for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920 (2000). At step one, it must be determined whether the claimant is gainfully employed. The ALJ found that plaintiff had not engaged in substantial gainful activity since her alleged disability onset date, September 9, 1998. At step two, it must be determined whether a claimant suffers from a severe impairment. The ALJ

---

[1] Plaintiff's date of birth is redacted back to the year of birth in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

[2] Plaintiff filed a previous application for DI benefits on July 16, 1999. This application was denied initially on February 28, 2000, with no further appeal taken.

found that plaintiff had the following severe impairments: connective tissue disease, fibromyalgia, vertigo, and right labyrinthine dysfunction. Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found that plaintiff's impairments did not meet or equal the requirements of a listed impairment. If a claimant's impairments do not meet or equal a listing, the Commissioner must assess residual functional capacity (RFC) and determine at step four whether the claimant has demonstrated an inability to perform past relevant work. The ALJ found that plaintiff maintained the residual functional capacity ("RFC") to perform her past relevant work as an accounts payable clerk and an agriculture mapping clerk. If a claimant demonstrates an inability to perform past relevant work, the burden shifts to the Commissioner to demonstrate at step five that the claimant retains the capacity to make an adjustment to work that exists in significant levels in the national economy. Because the ALJ found plaintiff capable of performing her past relevant work, step five was not addressed.

This Court's review of the ALJ's decision is limited to whether the decision is in accordance with the law and the findings supported by substantial evidence in the record as a whole. *See Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Substantial evidence means more than a scintilla, but less than a preponderance; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). If there is more than one rational interpretation, one of which supports the ALJ's decision, the Court must uphold that decision. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

In this case, plaintiff does not challenge the ALJ's determinations at steps one, two, or three. However, plaintiff argues that the ALJ improperly rejected the uncontradicted opinions of her treating physicians Michael McCormack, M.D., Jarl Wathne, M.D., James Lee, M.D., and her physical therapist Lisa Yonkers; improperly rendered an adverse credibility finding; and improperly assessed her RFC. Plaintiff further argues that the ALJ erred at step four by failing to consider all of her limitations, and by failing to complete a functional analysis. Plaintiff asks the Court to

enter judgment finding her disabled and awarding benefits. Alternatively, plaintiff asks the Court to find her disabled from her alleged disability onset date, September 9, 1998 through May 3, 2000, her treatment period by Dr. Wathne, and remand this case for the ALJ to determine whether her disability continued after May 3, 2000. Plaintiff also asks the Court to remand for the Commissioner to consider whether to reopen the February 28, 2000 decision denying plaintiff's July 16, 1999 application for benefits pursuant to 20 C.F.R. § 404.987, *et seq*. The Commissioner asserts that the ALJ's decision is supported by substantial evidence and free of legal error. However, for the reasons described below, the undersigned concludes that this matter should be remanded for an award of benefits.

The Court has discretion to remand for further proceedings or to award benefits. *See Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990). The Court may direct an award of benefits where "the record has been fully developed and further administrative proceedings would serve no useful purpose." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002).

> Such a circumstance arises when: (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if he considered the claimant's evidence.

*Id*. at 1076-77.

### Medical Opinion Evidence

Generally, more weight should be given to the opinion of a treating physician than to a non-treating physician, and more weight to the opinion of an examining physician than to a non-examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Where not contradicted by another physician, a treating or examining physician's opinion may be rejected only for "'clear and convincing'" reasons. *Id*. (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991)). Where contradicted, a treating or examining physician's opinion may not be rejected without "'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Id*. at 830-31 (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)); s*ee also Smolen*

*v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (opinions of specialists given more weight than non-specialists). Where the opinion of the treating physician is contradicted, and the non-treating physician's opinion is based on independent clinical findings that differ from those of the treating physician, the opinion of the non-treating physician may itself constitute substantial evidence. *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). It is the sole province of the ALJ to resolve this conflict. *Id*.

"Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, [the Court credits] that opinion as a 'matter of law.'" *Lester*, 81 F.3d at 834. Crediting an opinion as a matter of law is appropriate when, taking that opinion as true, the evidence supports a finding of disability. *See, e.g., Schneider v. Commissioner of Soc. Sec. Admin.*, 223 F.3d 968, 976 (9th Cir. 2000). However, courts retain flexibility in applying this "'crediting as true' theory." *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003)(remanding for further determinations where there were insufficient findings as to whether plaintiff's testimony should be credited as true). As stated by one district court, "In some cases, automatic reversal would bestow a windfall upon an undeserving, able claimant." *Barbato v. Commissioner of Soc. Sec. Admin.*, 923 F. Supp. 1273, 1278 (C.D. Cal. 1996)(remanding for further proceedings where the ALJ made a good faith error, in that some of his stated reasons for rejecting a physician's opinion were legally insufficient).

In this case, the ALJ summarized the medical evidence relating to plaintiff's complaints of dizziness as follows:

> The claimant went to the emergency room in September 1998 with complaints of dizziness but her work-up was essentially negative. She was seen by a Michael McCormack, M.D. as well as a neurologist, and by an ear, nose and throat surgeon and multiple tests were done, which were basically negative. The only positive finding was a positive ANA on October 19, 1998, which Jarl Wathne, M.D. reported was possibly lupus, and, which may have been the cause of her dizziness (Exhibits 1F-2F, 5F).
>
> In November 1998 Jamal Ali, M.D. reported that the claimant continued to complain of dizziness with nausea and vomiting, which was mostly likely peripheral in origin with possible Vestibular Neuritis. Her MRA and brain MRI were unremarkable. Dr.

>Ali started the claimant on Phenergan and encouraged her to do exercises for vertigo. He also reported the claimant's headaches were controlled by Elavil (Exhibits 2F/2, 10 and 3F, 9F/7).
>
>In an examination dated February 1999, Raymond Malamet, M.D., a rheumatologist, reported the claimant complained of dizziness, fatigue and arthralgias associated with attacks of Raynaud's and positive ANA. Dr. Malamet also reported that the claimant has a moderately elevated Westergren sedimentation rate and on examination she had some vascular reactivity. Based on x-rays, Dr. Malamet diagnosed the claimant with connective tissue disease. The claimant was continued on Celebrex and started on Prednisone and by April 1999 she had some improvement with significant reduction in her pain. The claimant was sleeping better (Exhibit 4F/3-16).
>
>In August 1999 the claimant related that her dizziness was worse in the morning and abated by afternoon. Her overall systemic symptoms of fatigue and arthralgias were improving and she had no new symptoms to report. Dr. Malamet assessed mild connective tissue disease and he was unsure of the etiology of the claimant's dizziness. . . . (Exhibit 4F/1-2).
>
>The claimant underwent electronystagmography in January 2000, which Dr. Wathne reported showed minimal left beating nystagmus present in sitting, supine, head right, and head left, nonlocalizing. It showed unilateral weakness to the right side, localizing. Dr. Wathne reported this was an abnormal ENG suggesting right peripheral weakness (Exhibit 10F/6). Following these results and after examination, Dr. Wathne diagnosed the claimant with right labyrinthine dysfunction. Dr. Wathne switched the claimant from HCTZ to Dyazide, a strict low salt diet and vestibular rehabilitation. In May 2000 the claimant related that she had stopped vestibular rehabilitation as it was making her dizziness worse. She was using a cane for walking and she continued to experience dizziness by turning around in her kitchen. Dr. Wathne continued to report that the claimant's problems was a right labyrinthine dysfunction likely related to autoimmune inner ear disease secondary to connective tissue disorder and autoimmune process (Exhibit 10F/1).
>
>. . .
>
>The claimant underwent physical therapy for her right vestibular dysfunction from February 2000 until her discharge in May 2000. At discharge the claimant's therapist, Lisa Yonkers, reported that the claimant had reached a plateau in her progress. The claimant continued to have nausea and vomiting but she had made gains with her gait and the use of straight cane. The claimant was able to move her head while in motion without the loss of balance and she was able to drive (Exhibits 12F, 15F).
>
>The claimant established care at the Everett clinic in December 2000 to treat her medical problems of connective tissue disease, Raynaud's disease, hypertension, labyrinthitis, lupus and dizziness. Upon examination, James Lee, M.D. reported that the claimant was in no acute distress and her blood pressure was 150/90. . . . (Exhibit 13F/8-9).

(AR 23-25). The ALJ noted that there is a large gap in plaintiff's medical history from November 2001 until January 2003 when plaintiff's physical therapist Ms. Yonkers, and treating physician

REPORT AND RECOMMENDATION RE: SOCIAL
SECURITY DISABILITY APPEAL
PAGE -6

Dr. Lee made declarations in support of plaintiff's claim for DI benefits.  (AR 25).  The ALJ then provided the following reasons for rejecting Ms. Yonkers' and Dr. Lee's declarations:

> Ms. Yonkers stated that she had 17 therapy sessions with the claimant but she had not seen the claimant since May 2000, which was well over two years prior to her declaration (Exhibit 21F).  The undersigned accords little weight to Ms. Yonkers' statements, as she is not an acceptable medical source as noted in 20 CFR 404.1512. Further Ms. Yonkers had not seen the claimant in over two years and it appears that her statements were requested by the claimant's attorney in effort to generate evidence for the claimant's current appeal.
>
> Also in January 2003, James Lee, M.D. performed a declaration for the claimant's attorney but he had not seen the claimant since November 2001.  While Dr. Lee's statements in exhibit 22F have been duly considered, the undersigned does not give his opinions significant weight.  Dr. Lee had a treating relationship with the claimant but he had not seen or examined claimant in over one year and the last time he did not treat the claimant for the conditions in which she is alleging disability.  It is also emphasized that Dr. Lee's statements were not made in attempt to treat the claimant but rather, through attorney request in an effort to generate evidence for the current appeal.

(AR 25).

Plaintiff argues that the ALJ improperly rejected the uncontradicted opinions of her treating physicians Dr. McCormack, Dr. Wathne, Dr. Lee, and her physical therapist Ms. Yonkers, by failing to give clear and convincing reasons for the rejection.  Plaintiff argues that because all of her treating physicians diagnosed plaintiff as having chronic labyrinthitis, and because the Commissioner's medical expert, Dr. Nelp, testified that the medical evidence supports plaintiff's complaints, the ALJ should have found her disabled at least from September 1998 through May 2000.

The Commissioner responds that the ALJ did not erroneously reject evidence, but properly evaluated the conflicting medical evidence by summarizing it in detail and interpreting it.  The Commissioner argues that because the evidence was conflicting the ALJ was required to provide only specific and legitimate reasons for disregarding the opinions and that the ALJ met that burden.

/ / /

/ / /

1. <u>Dr. McCormack's Opinion</u>

Dr. McCormack, an internist, was plaintiff's primary care physician from September 1998 through March 1999 when she was evaluated for dizziness. (AR 245-55). In a November 2, 1999, report to the Social Security Administration, Dr. McCormack summarized his medical treatment as follows:

> [I]n September of 1998, [she] had acute onset of a rather severe dizziness. She was seen in the emergency room initially with an essentially negative work-up and then was seen here at my office on multiple occasions throughout from September to December of 1998 for evaluation of this. She was seen by myself, by a neurologist, and by an ear, nose and throat surgeon. Multiple tests were done which were essentially negative. The only positive finding was a positive ANA which was initially positive on October 19, 1998. This was thought to possibly represent lupus, although it was difficult to attribute her dizziness to this. An ANA was done on November 4 and was negative. She was then evaluated by Neurology. Again, her ANA was repeated, now on December 29th, and again was positive. I did discuss this at length with Rheumatology and she was referred to them, and eventually a diagnosis of lupus was made.

(AR 227). Although Dr. McCormack was unsure of the etiology of plaintiff's dizziness, he concluded that plaintiff had been disabled during the entire period that he had treated her, "When I last saw her on March 31st, she was quite fatigued and still having some dizziness. . . . <u>Throughout that time, she had difficulty driving and walking and I certainly look at her as being completely disabled from the period of September of 1998 through the last time I saw her and certainly beyond</u>." (AR 227)(emphasis added).

It is not entirely clear what weight the ALJ accorded Dr. McCormack's opinions. The ALJ referenced Dr. McCormack's treatment of plaintiff during the initial onset of her dizziness and vertigo. However, the ALJ did not offer any explanation for not incorporating Dr. McCormack's assessment of plaintiff's limitations into her decision, and erroneously concluded that the "record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision."

Plaintiff argues that the ALJ improperly rejected Dr. McCormack's opinion by concluding that the record "does not contain any opinion from treating or examining physicians indicating that

the claimant is disabled . . . ." Plaintiff contends that when an ALJ misstates medical opinion evidence, the ALJ necessarily fails to give a valid reason for rejecting it. The Commissioner argues that Dr. McCormack's opinion is internally inconsistent and does not support a finding of disability. The Commissioner maintains that the ALJ's misstatement was harmless error because the Court can reasonably infer from the record why the ALJ did not accord controlling weight to Dr. McCormack's opinion. (Dkt. #11 at 7).

A review of the record shows that Dr. McCormack's medical opinion finding plaintiff disabled from September 1998 through March 1999 is not contradicted directly by any other physician and is not internally inconsistent. Rather, as medical expert Dr. Nelp testified, "The diagnosis and the initial events are very strongly supported by the medical records." (AR 381). It does not appear that the ALJ considered whether Dr. McCormack's opinions supported a finding of disability. Indeed, it is not even clear that she rejected his opinions at all. Accordingly, Dr. McCormack's opinion that plaintiff was "completely disabled from the period of September of 1998 through the last time I saw her and certainly beyond," may be credited as a matter of law.

2.      Dr. Wathne's Opinion

Dr. Wathne, an ear, nose, and throat specialist, first saw plaintiff for evaluation of her dizziness on October 13, 1998. He performed neurological testing which showed "rapid alternating hand and finger movements were normal on the right but mildly slow and incoordinated on the left. On Romberg she consistently fell towards the right side. She could not do tandem gait. Finger-to-nose testing was normal bilaterally. Dix-Hallpike with Frenzel glasses showed slight spontaneous left beating nystagmus but no positional vertigo." (AR 181). Dr. Wathne ordered an MRI of the head as well as blood work. He advised plaintiff "that if she was constantly dizzy she should not be driving nor should she be doing any work with machinery or at heights." (AR 181). On November 3, 1998, Dr. Wathne noted that plaintiff's "blood work is consistent with an autoimmune process, possibly lupus, and this may result in her dizziness." (AR 180). Dr. Wathne referred her back to Dr. McCormack for further work-up of the autoimmune process.

01   Plaintiff returned to Dr. Wathne on December 2, 1999. Dr. Wathne notes that plaintiff

02 "comes in one year after a previous workup for vertigo which found significant autoimmune lab

03 abnormalities. She obtained a workup via Dr. Malmet and she is now on Prednisone 5 mg per day

04 for a connective tissue disease. However, [Dr. Malmet] does not feel that her vertigo is secondary

05 to this disorder. She complains of feeling nauseated all of the time with chronic vertigo made

06 worse by any kind of motion." (AR 258-59). On January 10, 2000, plaintiff underwent an

07 electronystagmography ("ENG") which Dr. Wathne reported showed "minimal left beating

08 nystagmus present in sitting, supine, [head right and head left], nonlocalizing. Unilateral weakness

09 to the right side, localizing." (AR 262). Dr. Wathne reported this was an "[a]bnormal ENG

10 suggesting right peripheral weakness." (AR 257). His impression was "[r]ight labyrinthine

11 dysfunction, possibly autoimmune, versus atypical endolymphatic hydrops." (AR 257). Dr.

12 Wathne switched plaintiff's prescription from HCTZ to Dyazide, directed her to follow a low salt

13 diet, and referred her to Lisa Yonkers for vestibular rehabilitation. (AR 257).

14   On May 3, 2000, Dr. Wathne stated that plaintiff stopped her vestibular rehabilitation

15 because she felt it was making her dizziness worse. Dr. Wathne opined that she has "right

16 labyrinthine dysfunction likely related to autoimmune inner ear disease secondary to connective

17 tissue disorder and autoimmune process." (AR 256).

18   Again, it is not entirely clear what weight the ALJ accorded Dr. Wathne's opinion. The

19 ALJ did not expressly reject Dr. Wathne's opinion. Rather, the ALJ noted Dr. Wathne's opinion

20 that plaintiff suffers from right labyrinthine dysfunction. (AR 23-24). Furthermore, Dr. Wathne's

21 medical opinion that plaintiff suffered from chronic disequilibrium and dizziness from September

22 1998 through at least May 2000 is not contradicted directly by any other physician. Indeed, Dr.

23 Nelp agreed with the diagnosis of plaintiff's impairments:

24   The big issue that's been discussed is the dizziness and vertigo, and she had – she
     appeared in the ER in Exhibit 2 in 1998, and that's the alleged date of onset, in the
25   papers with acute vertigo. And typically – this is a typical start for acute labyrinthitis,
     as its called. And the cause of it is often a mystery. It may be a virus, it may be a
26   temporary thing. It gets in there and screws up the mechanism. The big thing you

REPORT AND RECOMMENDATION RE: SOCIAL
SECURITY DISABILITY APPEAL
PAGE -10

want to determine that it isn't in the brain, and that's – that was done with an MRI of the brain . . . right up front, and they said no, you have typical labyrinthitis, you'll get over it. And it can be very violent, it makes you feel like the devil . . . because you have no control of your surroundings, but ordinarily you recover from that in a matter of weeks, and many people have residual that last for months, but it's just – they notice and [sic] occasional feeling of dizziness or something. So those records are pretty, pretty complete.

(AR 373-74). Because the ALJ failed to give clear and convincing reasons for rejecting Dr. Wathne's opinion, his opinions should be credited as a matter of law. *Lester*, 81 F.3d at 834.

3.  Ms. Yonkers' Opinion

Ms. Yonkers, a physical therapist, treated plaintiff for her labyrinthitis 17 times between February and May 2000 when she was discharged because she had "reached a plateau in her progress." (AR 268). In her discharge summary, Ms. Yonkers reported:

At this time the [patient] continues to [complain of] severe nausea, and vomiting once she is home from therapy. It is felt that the areas in which the [patient] has made some gains is with her gait pattern and use of the straight cane. The [patient] is also able to move the head while in motion without loss of balance. She has been able to progress her exercises, starting at a supine position to standing. The [patient] is also driving herself, and not relying on her neighbor. Balance Master Testing still exhibits problems with the use of the vestibular system for balance, and her overall score has remained a 46%.

(AR 267). On January 9, 2003, Ms. Yonkers prepared a declaration describing plaintiff's condition in response to a request from plaintiff's attorney. (AR 321-24).

The ALJ assigned "little weight" to Ms. Yonkers declaration noting that she is not an "acceptable medical source" under 20 C.F.R. § 404.1513(a). As a physical therapist, Ms. Yonkers was an "other source" that the ALJ may consider pursuant to 20 C.F.R. § 404.1513(d). An ALJ is free to reject the opinions of other treating sources by providing germane reasons for rejecting those opinions. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). The ALJ further found Ms. Yonkers' declaration untrustworthy because she had not seen plaintiff in over two years and because her statements were solicited by plaintiff's attorney "in effort to generate evidence for the claimant's current appeal." (AR 25).

Plaintiff contends that assigning little weight to Ms. Yonkers' opinions on such grounds

is an error of law. As plaintiff points out, the Ninth Circuit has made clear that "in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it." *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998). The Court agrees. In the present case, the purpose for which Ms. Yonkers' declaration was obtained does not provide a legitimate basis for rejecting it. Ms. Yonkers' opinions were based on her evaluation and treatment of plaintiff and are supported by the medical records. Furthermore, medical expert Dr. Nelp specifically relied on Ms. Yonkers evaluation of plaintiff as an objective measure of the severity of plaintiff's dizziness. Even if Ms. Yonkers is not an acceptable medical source on which to find an impairment, her opinions could be used to assess the severity of plaintiff's impairments and their effect on plaintiff's ability to work. Given the insufficiency of the ALJ's analysis, the Court cannot accept the ALJ's justification for assigning little weight to Ms. Yonkers' opinion.

4.  <u>Dr. Lee's Opinion</u>

The ALJ also discounted the declaration of Dr. Lee, an internist, who treated plaintiff between December 2000 and November 9, 2001, after she relocated from Maryland to Washington State. (AR 326-28). Dr. Lee's declaration states, in part, as follows:

> Q   Did you refer Ms. Benedict to an ear specialist for further evaluation of her vestibular disorder?
> A   No. I believe her condition was stable when she saw me. She had probably received maximum medical therapy, including physical therapy for her balance problem.
> Q   You saw her two more times after your labyrinthitis diagnosis in January 2001. You didn't mention her balance problem in either of those later notes. Does that mean she was cured?
> A   No, only that I did not treat her for it in either of those visits.

(AR 328). In discounting Dr. Lee's opinions, the ALJ noted that "Dr. Lee had a treating relationship with the claimant but he had not seen or examined the claimant in over one year and the last time he did not treat the claimant for the conditions in which she is alleging disability." (AR 25). The ALJ also emphasized that Dr. Lee's statements "were not made in attempt to treat the claimant but rather, through attorney request in an effort to generate evidence for the current

REPORT AND RECOMMENDATION RE: SOCIAL
SECURITY DISABILITY APPEAL
PAGE -12

appeal." (AR 25).

Again, "the purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them." *Lester*, 81 F.3d at 832; *Reddick*, 157 F.3d at 726. An ALJ may question a physician's credibility when the opinion, as here, was solicited by plaintiff's attorney. *Saelee v. Chater*, 94 F.3d 520, 522-23 (9th Cir. 1996). But an ALJ may not automatically reject the opinion for that reason alone. "The Secretary may not assume that doctors routinely lie in order to help their patients collect disability benefits." *Ratto v. Secretary*, 839 F. Supp. 1415, 1426 (D. Or. 1993). Here, there is no evidence of impropriety. Indeed, Dr. Lee's medical records fully support his opinions. Moreover, the consultative physician's reports concur with Dr. Lee's opinion that plaintiff's vestibular disorder was stable but had not been fully resolved. Accordingly, the ALJ failed to proffer sufficient reasons for rejecting the opinions of Dr. Lee, and his declaration should be credited as a matter of law.

<u>Plaintiff's Credibility</u>

Absent evidence of malingering, an ALJ must provide clear and convincing reasons to reject a claimant's testimony. *See Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). In finding a social security claimant's testimony unreliable, an ALJ must render a credibility determination with sufficiently specific findings, supported by substantial evidence. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834. "We require the ALJ to build an accurate and logical bridge from the evidence to her conclusions so that we may afford the claimant meaningful review of the SSA's ultimate findings." *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). "In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains." *Light v. Commissioner Soc. Sec. Admin.*, 119 F.3d 789, 792

(9th Cir. 1997).

In this case, the ALJ assessed plaintiff's credibility as follows:

> The claimant's testimony is generally credible, but not to the extent alleged. Despite her allegations of disabling symptoms and pain, the claimant attends church once a week, grocery shops, cooks, watches television, reads, does cross-stitch and she does the laundry as well as doing some light housekeeping and she spends time with her grandchildren (Exhibits 3E, 11E, testimony). She testified she does not drive but her physical therapist noted that she drove herself to the appointment, not having to rely on her neighbor (Exhibit 12F/1).
>
> The record reveals that the claimant failed to follow-up with recommends [sic] made by her treating doctor, which suggests the symptoms may not have been as serious as has been alleged (Exhibit 13F/1).
>
> As the medical expert indicated the severity of the claimant's impairments turns solely on the claimant's credibility because normally an undifferential tissue disease would not cause the symptoms the claimant alleges. The claimant has very little medical records/visits for the alleged severity of her symptoms. For example, no treatment since November 9, 2001 as noted in exhibits 20F and 22F from Dr. Lee, her treating doctor. It is difficulty [sic] to understand the extensive medication list as exhibit 23F, as her last two doctor visits were for intermittent discomfort and asthma. She was in no distress and examination was basically normal.

(AR 26-27).

Here, there are no allegations that plaintiff was malingering, so the ALJ was required to provide clear and convincing reasons for rejecting her testimony. The ALJ, however, failed to meet this burden. The ALJ acknowledged plaintiff's range of alleged impairments, but considered plaintiff's daily routine, which involves grocery shopping, reading, watching television, laundry, and other light housekeeping duties, to be inconsistent with those impairments. AR 26. The Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan,* 260 F.3d at 1050; *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)(noting that several courts "have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."); *see also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)("Many home activities are not easily

transferable to . . . the more grueling environment of the workplace, where it might be impossible to rest or take medication."). Furthermore, an examination of the record shows that the ALJ erred in characterizing plaintiff's daily activities. Plaintiff testified that she spends the majority of each day at home and estimated that she only leaves her home four days a month to attend church services and two days a month to shop and attend medical appointments. (AR 352-53). She explained that she had to give up driving in May 2000, and relies on friends to get around. (AR 353). She also explained that grocery shopping is difficult because it requires her to look from side to side and she has to wait until her "eyes catch up with [her] brain." She can read and write only if she does not move her head. (AR 357). The activities plaintiff described to her physicians and at her hearing are not inconsistent with her alleged level of impairment.

The ALJ also discredited plaintiff because of her failure to follow prescribed medical treatment, specifically, to increase her amitriptyline dose from 75 mg to 112 mg and begin DHEA (Dehydroepiandrosterone) supplementation. (AR 277). A claimant may be denied benefits pursuant to 20 C.F.R. § 404.1530(a) if the Secretary determines that the claimant failed to follow a prescribed treatment and that if the claimant had followed the prescribed treatment, his or her ability to work would be restored. *See Hammock v. Bowen*, 879 F.2d 498, 504 (9th Cir. 1989). Here, there is no evidence that the ALJ determined that if plaintiff had followed the prescribed treatment her ability to work would be restored.

The ALJ also found that plaintiff's "medical records/treatment" were minimal for the alleged severity of her symptoms, noting a gap in plaintiff's medical history from November 2001 until January 2003. (AR 27). The Court disagrees. The record does not show marked differences between plaintiff's assessment of her restrictions and those made by plaintiff's treating physicians. Indeed, plaintiff's problems with dizziness are well documented. Given the nature of connective tissue disease, fibromyalgia, vertigo, right labyrinthine dysfunction, plaintiff's symptoms, and the medical evidence that supports those findings, the ALJ committed error when she discredited plaintiff's testimony for lack of medical evidence.

REPORT AND RECOMMENDATION RE: SOCIAL
SECURITY DISABILITY APPEAL
PAGE -15

01    These reasons offered by the ALJ are insufficient for rejecting plaintiff's testimony. Given
02 the above, the undersigned concludes that the ALJ failed to offer sufficient reasons to reject
03 plaintiff's testimony regarding the severity of her symptoms. Therefore, the Court must determine
04 whether plaintiff's testimony should be credited as true. A claimant's testimony may be credited
05 as true where the ALJ improperly rejects the claimant's testimony as to his or her limitations.
06 *Lester*, 81 F.3d at 834 ("[W]here the ALJ improperly rejects the claimant's testimony regarding
07 his limitations, and the claimant would be disabled if his testimony were credited, 'we will not
08 remand solely to allow the ALJ to make specific findings regarding that testimony.' Rather, that
09 testimony is also credited as a matter of law.") (internal citations omitted) (quoting *Varney v.
10 Secretary of Health and Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988)). Crediting
11 testimony as a matter of law is appropriate when, taking that testimony as true, the evidence
12 supports a finding of disability. *See*, *e.g.*, *Schneider v. Commissioner of Social Sec. Admin.,* 223
13 F.3d 968, 976 (9th Cir. 2000) ("When the lay evidence that the ALJ rejected is given the effect
14 required by the federal regulations, it becomes clear that the severity of [plaintiff's] functional
15 limitations is sufficient to meet or equal [a listing.]"); *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th
16 Cir. 1996) (ALJ's reasoning for rejecting subjective symptom testimony, physicians' opinions, and
17 lay testimony legally insufficient; finding record fully developed and disability finding clearly
18 required). However, courts retain flexibility in applying this "'crediting as true' theory."*Connett
19 v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (remanding for further determinations where there
20 were insufficient findings as to whether plaintiff's testimony should be credited as true).
21    In this case, the Vocational Expert testified at the hearing that all jobs would be eliminated
22 if plaintiff's testimony was taken as fully credible, due to her visual inability to track and focus as
23 a result of her vestibular disorder. (AR 386, 391). The Vocational Expert also stated that the
24 need to take a nap up to four hours a day would further erode plaintiff's ability to perform past
25 relevant work. (AR 387). Therefore, taking plaintiff's testimony as true, the evidence supports
26 a finding of disability in this case. For this reason, the undersigned recommends that this matter

REPORT AND RECOMMENDATION RE: SOCIAL
SECURITY DISABILITY APPEAL
PAGE -16

be remanded for an award of benefits.[3]

## CONCLUSION

Crediting plaintiff's testimony as to her limitations and the opinions of her treating physicians as a matter of law, the Court finds no outstanding issues in need of resolution and that it is clear from the record that the ALJ would be required to find plaintiff disabled. *See McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002) (the Court may direct an award of benefits where "the record has been fully developed and further administrative proceedings would serve no useful purpose."); *see also Smolen*, 80 F.3d at 1292 (ALJ's reasoning for rejecting subjective symptom testimony, physicians' opinions, and lay testimony legally insufficient; finding record fully developed and disability finding clearly required). Accordingly, the Court finds plaintiff entitled to an award of benefits. On remand, the ALJ should also consider whether to reopen the February 28, 2000 decision denying plaintiff's July 16, 1999 application for DI benefits under 20 C.F.R. § 404.987, *et seq*. A proposed order accompanies this Report and Recommendation.

DATED this 20th day of September, 2005.

Mary Alice Theiler
United States Magistrate Judge

---

[3] Rejecting plaintiff's credibility, the ALJ assessed plaintiff's RFC as follows:

> The claimant retains the residual functional capacity to perform light work, or work that does not require lifting and carrying more than 20 pounds occasionally and ten pounds frequently, sitting more than six hours in an eight-hour day and standing and/or walking more than six hours in an eight-hour day. Additionally, the claimant is limited to no climbing, no frequent change of workstations, no balancing and she should avoid concentrated exposure to extreme temperatures and hazards such as heights and machinery. She is limited to occasional stooping, kneeling and crawling and uses a cane to help maintain balance.

(AR 27). As discussed above, taking plaintiff's credibility as true, the Court finds that the ALJ erred in assessing plaintiff's RFC. For the same reason, the Court also finds that the ALJ erred at Step Four in finding plaintiff capable of performing her past relevant work as an accounts payable clerk and an agriculture mapping clerk.